FILED

JUN 0 2 2015

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                      DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br>        v.<br><br>SUNIL SHARMA (1),<br>GOLD COAST HOLDINGS LLC (2),<br>SAFE HARBOR TAX LIEN<br>         ACQUISITION LLC (3),<br><br>                Defendants. | Case No.  15cr1396-JAH<br><br>I N F O R M A T I O N<br><br>18 U.S.C. 1343 - Wire Fraud |

The United States charges:

### INTRODUCTORY ALLEGATIONS

1.  Defendant Sunil Sharma was a Series 7 licensed broker, who had worked for Merrill Lynch, AG Edwards, and as an independent broker for Raymond James.

2.  In 2000, Sharma moved to San Diego where he continued to practice as an independent broker. Due to the market crash that followed September 11, 2001, Sharma and his clients lost a substantial amount of money. As a result, Sharma voluntarily gave up his license to act as a securities broker.

3. After relinquishing his broker's license, Sharma began to work in the insurance industry. In 2002, he began teaching seminars highlighting various types of insurance and annuities. Over the next 5 years, Sharma and his wife sold insurance out of their business in Rancho Bernardo, California.

4. In 2007, Sharma attended an "Investools" workshop that convinced him that he could make money trading stock options in a conservative manner. After attending the workshop, Sharma set up Gold Coast Holding, LLC ("Gold Coast") as a vehicle to trade options. Sharma funded Gold Coast with approximately $50,000 of his own money that he had made selling insurance.

5. Sharma began making money with Gold Coast using "technical analysis," coupled with "bull and bear call spreads." A bull call spread is a strategy typically used when a moderate rise in the price of the underlying asset is expected, and a bear call spread is used when a decline in the price of the underlying asset is expected.

6. Utilizing his bull and bear spread analysis, Sharma experienced "beginners luck" and began generating profits of more than 10% on his investment by late 2007. At the same time, he learned that his insurance clients were making very little money on their personal investments due to low interest rates. Accordingly, Sharma thought that he could offer these clients a better return (somewhere in the "neighborhood" of 5%-6%) if he could "day trade" their money and "pocket the difference."

7. Beginning in early 2008, Sharma began raising money through Gold Coast by soliciting funds from his insurance clients. He falsely told these clients that Gold Coast was an extremely safe

way to earn a monthly retirement income because their money was to be: (1) part of a diversified portfolio; (2) pooled with many other investors; (3) used to buy bonds from emerging markets in Brazil, Russia, India, and China ("BRIC"); and (4) managed by Goldman Sachs. Sharma set the initial minimum contribution at $50,000 and guaranteed investors a rate of return (typically between 6%-7%) for two to three years.

8. Initially, Sharma planned on buying BRIC bonds with half the investor funds and day trading with the other half. In fact, Sharma never purchased BRIC or any other type of bonds. Instead, he used all the money to day trade from TDAmeritrade's "thinkorswim" trading platform.

9. In 2008 and 2009, Sharma raised approximately $3.5 million from investors. Despite some early successes, he was left with only about $250,000 by the end of 2009. As a result, Sharma effectively turned Gold Coast into a classic "Ponzi scheme" by paying earlier investors their guaranteed rates of return with funds he solicited from new investors.

10. Between January 2010 and November 2014, in order to continue his day trading activities and conceal his fraud, Sharma raised approximately $5 million in additional funds. Sharma raised approximately $800,000 from investors using a second limited liability corporation, Safe Harbor Tax Lien Acquisition, LLC ("Safe Harbor").

11. Sharma falsely touted Safe Harbor as a safe investment secured by tax liens purportedly purchased at a discount rate. Sharma falsely claimed that these investments paid a fixed amount of interest based upon the tax liens he collected. In reality, Sharma

purchased no liens, and all the investors' funds went into his day trading activities.

12. Sharma also used Gold Coast to raise approximately $100,000 in investor funds by claiming that the funds would be invested in the Royal Garden Villas & Resort in Bangalore, India. Once again, these funds were diverted to his day trading activities.

13. Prior to the investment scheme collapsing, Sharma stopped trading option spreads and switched over to purchasing straight "call" and "put" options. Call options provide the holder the right (but not the obligation) to purchase an underlying asset at a specified price ("the strike price"), for a certain period of time. If the stock fails to meet the strike price before the expiration date, the option expires and becomes worthless. Investors buy calls when they think the share price of the underlying security will rise or sell a call if they think it will fall. Put options give the holder the right to sell an underlying asset at the strike price. The seller (or writer) of the put option is obligated to buy the stock at the strike price. Put options can be exercised at any time before the option expires. Investors buy puts if they think the share price of the underlying stock will fall, or sell one if they think it will rise.

14. It was his hope that adopting this new strategy would allow him to recoup all of his investment losses. Once again, however, Sharma's strategy proved disastrous. Although he was able to make his December 2014 monthly payout to his investors, he ran out of funds in January 2015.

15. Between January 2008 and November 2014, in total, Sharma raised $8,363,477 from 32 different clients. While soliciting

these funds for Gold Coast and Safe Harbor, Sharma acted within the scope of his authority and to benefit these companies. As part of his Ponzi scheme, Sharma paid $2,124,494 to old clients from funds generally derived from the contribution of later investors.

## COUNT 1

### 18 U.S.C. § 1343

### WIRE FRAUD

16. Paragraphs 1 through 15 of the Introductory Allegations are realleged and incorporated by reference.

17. Beginning in approximately January 2008, and continuing up to and through November 2014, within the Southern District of California and elsewhere, defendants SUNIL SHARMA, GOLD COAST HOLDINGS LLC, and SAFE HARBOR TAX LIEN ACQUISITION LLC, knowingly and with the intent to defraud, devised a material scheme to defraud clients and to obtain their money and property by means of materially false and fraudulent pretenses, representations and promises, and by intentional concealment and omission of material facts.

### METHODS AND MEANS

18. It was a method and mean of the scheme that Sharma would use Gold Coast and Safe Harbor to trade securities on behalf of various clients despite the fact that he did not possess a Series 7 license.

19. It was a further part of the scheme that Sharma would falsely tell investors that their principal was secure, unless "the entire world financial economy collapsed."

20. It was a further part of the scheme that Sharma would conceal from investors that he was using their funds to trade options

1  on a daily basis - as he knew that they would not have invested had
2  they known the truth.
3      21.  It was a further part of the scheme that Sharma urged
4  clients to liquidate their retirement accounts and annuities based
5  upon the safety of his investment scheme.
6      22.  It was a further part of the scheme that despite
7  massive losses at Gold Coast and Safe Harbor, Sharma continued to
8  falsely tell investors that their investments were doing well.
9      23.  It was a further part of the scheme that Sharma would
10 send investors monthly or quarterly statements from Gold Coast and
11 Safe Harbor that falsely reflected that their investments were
12 generating the promised returns.
13     24.  It was a further part of the scheme that Sharma would
14 falsely tell investors in Safe Harbor that their investments would be
15 secured by the liens which he was purchasing on the company's behalf.
16     25.  It was a further part of the scheme that Sharma would
17 conceal from his wife and fellow officer the fraudulent activity
18 occurring at Gold Coast and Safe Harbor.
19     26.  It was a further part of the scheme that Sharma would
20 divert approximately $2.5 million in investor funds for his own
21 personal use, including: (1) approximately $700,000 towards the down
22 payment of a $2 million home off Artesian Road in San Diego; (2)
23 approximately $12,000 for a cruise in the Mediterranean; and (3) for
24 leasing a Mercedes SL and a BMW.
25 //
26 //
27 //
28 //

**INTERSTATE WIRE**

27. On or about October 4, 2013, for the purpose of executing an essential part of the aforesaid scheme and artifice, defendant SUNIL SHARMA, GOLD COAST HOLDING LLC, and SAFE HARBOR TAX LIEN ACQUISITION LLC, caused to be transmitted by wire in interstate commerce certain writings, signs, and signals, to wit: an email sent to M.H., falsely listing the value of his investment.

All in violation of Title 18, United States Code, Section 1343.

LAURA E. DUFFY
United States Attorney

6/20/15
DATED

PHILLIP L.B. HALPERN
Assistant U.S. Attorney